José A. Domínguez, demandante y apelante, *v.* Carmen Nadal Viuda de Del Moral, sustituída en apelación por su Sucesión y su Albacea y Administrador Judicial Esteban Ferrer, demandada y apelada.

No. 6042.—*Sometido:* Mayo 2, 1933.—*Resuelto:* Julio 19, 1933.

472

*Pascasio Fajardo Martínez,* abogado del apelante; *José Sabater,* abogado de la apelada.

El Juez Asociado Señor Córdova Dávila, emitió la opinión del tribunal.

Allá por el año de 1916 José A. Domínguez y su esposa Micaela del Moral constituyeron hipoteca sobre un solar y edificio de su propiedad a favor de Carmen Nadal Viuda de del Moral por la cantidad de $5,000 que esta última facilitó a los esposos citados en calidad de préstamo. En 29 de julio de 1929 la mencionada señora Carmen Nadal viuda de del Moral fué declarada incapacitada para regir su persona y bienes, nombrándose para representarla como tutor a su hijo Francisco del Moral y Nadal, quien más tarde fué sustituído por María del Carmen del Moral Viuda de Romero por haber sido anulado judicialmente el nombramiento del primero y corresponderle la tutela a la hija mayor de la incapacitada, la referida María del Carmen del Moral Viuda de Romero. Francisco del Moral, mientras actuaba como tutor, entabló demanda a nombre de la incapacitada contra José A. Domínguez y su esposa, para hacer efectivo el crédito hipotecario por el procedimiento sumarísimo previsto por la Ley Hipotecaria y su reglamento. El demandante en el presente caso solicita la nulidad del procedimiento ejecutivo, alegando que cuando se inició dicho procedimiento el préstamo hipotecario había sido pagado personalmente a la acreedora Carmen Nadal viuda de del Moral.

Se alega en la demanda que el demandante y su esposa debían a la señora Nadal la suma total de $12,206.20, incluyendo la hipoteca de $5,000 sobre la finca que fué objeto del procedimiento ejecutivo. Se añade que se llevó a cabo un

convenio escrito entre la referida señora, representada por su apoderado Francisco del Moral, y el demandante José A. Domínguez, y que en virtud de este convenio se concedió a dicho demandante un descuento de $1,464.93 sobre el saldo que arrojaban las cuentas del demandante y su esposa, siempre que el pago se efectuara en cualquier momento dentro de noventa días a partir de la fecha del referido convenio. El demandante no satisfizo la suma convenida dentro del plazo de los noventa días, pero alega que la señora Nadal prometió mantener en vigor el convenio y que en 14 de mayo de 1921, le otorgó recibo de saldo de toda deuda, reclamación o acreencia, por capital e intereses, que hasta aquella fecha fueran en deberle don José Domínguez y su esposa doña Micaela del Moral de Domínguez. El documento que sirve de base al demandante para alegar que satisfizo a su madre política, la señora Nadal, el préstamo hipotecario, dice así:

"Entre don Francisco del Moral, apoderado de la señora viuda del Moral, y don José A. Domínguez, se ha convenido lo siguiente:

"Si el Sr. Domínguez o sus herederos entregan a la señora viuda del Moral la cantidad de diez mil setecientos cuarenta y un dollars con veinte y siete centavos ($10,741.27) en el término de noventa días a contar desde esta fecha, la señora Viuda del Moral otorgará recibo de saldo al señor Domínguez por la suma de doce mil doscientos seis dollars veinte centavos ($12,206.20) a que ascienden las cuentas que dicho señor Domínguez y su señora esposa deben a la Señora Viuda del Moral según memorándum comprensivo de sus distintas deudas fechado en treinta de abril del año en curso. Si en dicho plazo el Señor Domínguez o sus herederos no se aprovechan de esta concesión la señora Viuda del Moral queda en libertad absoluta de sostener o no sostener este convenio.

"Mayagüez, P. R., Mayo 24, 1920.
"C. N. Viuda del Moral.
"Por: (Fdo.) F. del Moral.
"(Fdo.) José A. Domínguez.

"En el día de hoy, sábado 14 de mayo de 1921, yo, Carmen Nadal Vda. de del Moral, SOSTENGO, RATIFICO Y AMPLÍO EL PRESENTE CONVENIO: RECIBÍ POR SALDO DE TODA DEUDA, RECLAMACIÓN O ACREEN-

CIA, POR CAPITAL E INTERESES QUE EN EL DÍA DE HOY SEAN EN DE-
BERME DON JOSÉ A. DOMÍNGUEZ Y SU ESPOSA DOÑA MICAELA DEL MORAL
DE DOMÍNGUEZ, solidaria o mancomunadamente.—Mayagüez, P. R.,
mayo 14 de 1921.

"(Fdo.) Carmen N. Vda. del Moral."

La parte demandada en su contestación niega que la se-
ñora Carmen Nadal Viuda de del Moral otorgara ningún
recibo ni documento de saldo, y niega además que el deman-
dante entregara a la referida señora dinero alguno en pago
de las deudas con ella contraídas. Alega que Francisco del
Moral, en su carácter de apoderado de la señora Nadal, in-
tervenía en todos sus asuntos, y cuando se hacían pagos a la
incapacitada, intervenía directamente en su carácter de apo-
derado y administrador de los bienes de doña Carmen Nadal
Viuda de del Moral, los cuales administró por un período
aproximado de veinticinco años. Añade que el demandante
en ninguna ocasión requirió a la acreedora o a su apoderado
para otorgar la escritura de cancelación de hipoteca y que
nunca supo que el importe de la hipoteca de referencia fuera
pagado, afirmando por el contrario que el demandante nunca
pagó a ninguna persona dicho crédito hipotecario en todo ni
en parte. Se niega además en la contestación que la firma
que se dice que es de Carmen N. Viuda de del Moral en el
documento transcrito en la demanda sea la firma genuina y
auténtica de la incapacitada. La corte inferior dictó sen-
tencia declarando sin lugar la demanda. El demandante in-
terpuso recurso de apelación atribuyendo a la corte inferior
veinticuatro errores.

Se alega en primer término que la corte inferior
cometió error al declarar sin lugar la moción del demandante
solicitando la eliminación de ciertos particulares de la con-
testación a la demanda complementaria. En la demanda se
alega que en el mes de abril del año de 1920 el demandante
y su esposa Micaela del Moral debían a la demandada Carmen
Nadal, por diversos conceptos, incluyendo la hipoteca de
$5,000 en cuestión, la suma total de $12,206.20, y que en 30

de abril dicha acreedora, Sra. Nadal, envió al deudor Sr. Domínguez un estado de esa cuenta que fué aceptado por éste. En la alegación que se trata de eliminar se dice que además de esa deuda de $12,206.20 el demandante y su esposa debían a la demandada $6,500 como anticipo de herencia, más $14,000 que se alega pagó la demandada, Sra. Nadal, por la mercantil Martínez & Domínguez, de la cual era socio el demandante, y que se hizo responsable del pago de las deudas de dicha mercantil en virtud de cierta escritura, y que la demandada también impuso en la mercantil Martínez & Domínguez $17,500 en efectivo en calidad de comandita, de la cual suma no ha rendido cuenta el demandante.

Las razones que se aducen para solicitar las eliminaciones apuntadas son que lo alegado es inmaterial, impertinente e irrelevante en relación a los hechos de la demanda con los cuales no tienen conexión alguna las alegaciones cuya eliminación se solicita.

Opinamos con el apelante que estas alegaciones no se relacionan directamente con los hechos controvertidos. Sin embargo, no vemos que se haya podido ocasionar perjuicio alguno al demandante con la evidencia aportada en apoyo de estas alegaciones superfluas, porque estos hechos, aunque se declaren probados, no tienen nada que ver con la cuestión fundamental que es si medió o no causa en el alegado otorgamiento del recibo que aparece suscrito por Carmen N. Viuda del Moral.

Se solicita también la eliminación del párrafo décimotercero de la contestación, con excepción de la primera parte donde se alega que la demandada niega que concediera al demandante sostener en vigor el contrato a que se refiere el párrafo décimotercero de la demanda, "pues en este negocio intervino siempre don Francisco del Moral y Nadal como apoderado de la incapacitada y acreedora y ésta nunca intervino personalmente en dicho negocio, y alega la demandada que dicho Francisco del Moral y Nadal nunca concedió alguna prórroga al demandante, sino que al vencerse el plazo

concedido consideró que el negocio estaba terminado por no haberse hecho uso de la concesión por el Sr. Domínguez y así siempre lo ha considerado dicho apoderado durante los nueve años que han transcurrido desde entonces sin que hasta la interposición de esta acción haya expuesto o expresado el demandante a don Francisco del Moral y Nadal ni tampoco a la incapacitada cuando se encontraba con capacidad legal que hubiera pagado ninguna suma de dinero por concepto alguno y siempre se consideró que el demandante no había pagado nunca dicha deuda ni ninguna otra contraída con la incapacitada.''

Se solicita la eliminación de las palabras que aparecen entre comillas. Creemos que la alegación ha podido ser más concisa y perfecta, y que las palabras ''pues en este negocio intervino siempre don Francisco del Moral y Nadal como apoderado de la incapacitada y acreedora y ésta nunca intervino personalmente en dicho negocio'' son más bien una explicación de la alegación contenida en las palabras precedentes que una alegación; pero en todo el hecho décimotercero hay alegaciones que no deben ser eliminadas, dada la naturaleza de los puntos en controversia y de las cuestiones que se plantean en la contestación a la demanda, y por lo tanto opinamos que la corte no cometió error al negar la eliminación del párrafo mencionado.

■ Se pide la eliminación de la última parte del hecho décimocuarto de la demanda. En este hecho se niega el otorgamiento del recibo de saldo y el pago del dinero, y luego se dice ''pues don Francisco del Moral y Nadal como apoderado que fué de la incapacitada intervenía en todos los asuntos de ésta y cuando se hacían pagos a la incapacitada, intervenía directamente dicho don Francisco del Moral y Nadal como tal apoderado, quien administraba los bienes de su Sra. madre doña Carmen Nadal Vda. del Moral, la demandada, y los administró por un período de más o menos veinte y cinco años.''

También en estas palabras la demandada trata de explicar

la razón de la negación que las precede. Estos hechos, alegados concisa y positivamente y no a manera de explicación, podrían tener cabida en la contestación. No fueron, sin embargo, eliminados por la corte y creemos que no se ha ocasionado perjuicio alguno al demandante. A lo sumo estos detalles han contribuído a informarle ampliamente de las alegaciones de la demandada y de las razones en que se basa para sostenerlas.

Del hecho décimoquinto de la contestación se solicitó la eliminación de los siguientes particulares:

"Y al contrario siempre se consideró y constaba a don Francisco del Moral y Nadal, como apoderado que fué de la demandada, que el demandante nunca había pagado la deuda hipotecaria de cinco. mil dollars ni sus intereses ni en todo ni en parte hasta el extremo que habiéndose vendido en pública subasta por falta de pago de contribuciones en 1928 la propia finca hipotecada, el colector de Rentas Internas de Mayagüez, se dirigió a la demandada como acreedora y ésta se vió obligada a pagar las contribuciones adeudadas por el demandante y éste nunca resarció de dichas contribuciones pagadas por ella como acreedora hipotecaria."

Entendemos que la corte no cometió error alguno al negar la eliminación del párrafo anteriormente transcrito.

■■ Copiamos a continuación los errores 2, 3, 4 y 5 que discutiremos conjuntamente porque todos ellos se refieren a la apreciación de la prueba:

"DOS.—La Corte Inferior erró al no haber conferido todo el valor legal que tiene el Exhíbit 'F' del Demandante, que consiste en un recibo, firmado de puño y letra de la acreedora hipotecaria, aquí demandada, Carmen Nadal Vda. del Moral, y el cual documento, conjuntamente con la otra prueba documental y testifical presentada, ha demostrado más allá de toda duda razonable que los cinco mil dollars de principal e intereses de la hipoteca en cuestión y en cuyo cobro se funda el procedimiento ejecutivo sumarísimo cuya nulidad se solicita, fueron pagados por los deudores hipotecarios a su acreedora con anterioridad a la fecha en que se inició dicho procedimiento ejecutivo sumarísimo.

"TRES.—La Corte Inferior actuó movida por pasión, prejuicio,

parcialidad y manifiesto error en la apreciación de la prueba y aplicación del derecho en este caso.

"CUATRO.—Al desatender la Corte Inferior la clara y preponderante prueba documental y testifical en corroboración de que la hipoteca en cuestión y sus intereses se encontraba totalmente pagada, violó los preceptos de nuestra Ley de Evidencia prescriptivos de la fuerza probatoria de los documentos.

"CINCO.—La Corte Inferior cometió error de derecho al no haber aplicado a este caso el claro y reconocido principio de la presunción que cobija en favor del recibo firmado de puño y letra de la acreedora hipotecaria Carmen Nadal Vda. del Moral, a favor de los deudores hipotecarios esposos José A. Domínguez y Micaela del Moral de Domínguez, y que es creditivo del pago de los $5,000.00, importe del principal de la hipoteca en cuestión y sus correspondientes intereses. Especialmente considerando que la autenticidad de la firma en el mismo fué preponderantemente probada, y que no existió prueba en contrario de su autenticidad, ni prueba que justifique la inferencia que lo que el recibo muestra por su faz no sea fiel reflejo de los hechos que el mismo integra."

Entiende el apelante que el recibo que ofrece en evidencia para demostrar que satisfizo el préstamo hipotecario prueba de modo concluyente que la hipoteca fué pagada. En apoyo de su contención cita a "Jones on Evidence", arguyendo que la presentación de un recibo presume el pago de una deuda y es evidencia de gran valor. De la obra citada por el apelante, tomo primero, página 337, tomamos lo siguiente:

"Generalmente la posesión por el deudor de un recibo de su acreedor se estima por el primero evidencia conclusiva de pago; pero con la variación en la forma del documento se ha creído necesario incluirlo dentro de las reglas de presunción relativas al pago de dinero, que depende del modo usual y conocido de hacer negocios reconocidos por las cortes. Casi todos los recibos por dinero caen dentro de una de estas tres divisiones: Recibos por completo pago, recibos en cuenta y recibos que reconocen pago de dinero sin hacer referencia a su propósito o aplicación; y estos recibos son gobernados por una regla común, y es que prima facie un recibo implica exactamente lo que dice, ni menos ni más. Si el recibo especifica que el pago ha sido completo, prima facie es así; si en cuenta, entonces prima facie se queda adeudando algo más, pero con el dere-

cho de las partes de demostrar en cada caso que el recibo es erróneo . . .''

En el tomo tercero, sección 491, de la misma obra explica Jones el valor probatorio de un recibo. Según dicho autor la parte que lo firma admite que el hecho que contiene es cierto. Esta admisión tiene el mismo carácter que una admisión verbal, con la diferencia de que su consignación por escrito es más segura y duradera que el simple recuerdo de un testigo de lo que se dijo y se hizo. ''No tiene el carácter de un contrato escrito, cuyo tenor y propósito no puede ser afectado por evidencia de lo que se dijo o hizo contrario a sus términos. La consecuencia es que, al igual que una simple admisión verbal, puede ser contradicho por evidencia demostrativa de que se basa en equivocación o sorpresa, de que se hizo para un propósito particular y que su uso fué limitado por convenio de las partes a ocasiones especiales. Si forma parte de un contrato y está incorporado en el escrito que contiene sus términos, puede ser todavía contradicho, y las estipulaciones basadas en la causa (*consideration*) que se admite como recibida, pueden fracasar en tales casos por falta de causa (*want of consideration*). De ahí la regla de que un recibo escrito para el pago de dinero no es conclusivo y está sujeto a explicación mediante evidencia oral.''

Refiriéndose a los efectos de un recibo cuando no ha sido explicado, dice el mismo autor en el tomo tercero, sección 492, de su citada obra:

''Un recibo escrito es evidencia de alta calidad. Aunque no concluyente, prima facie es evidencia de la verdad de su contenido. Es una evidencia tan satisfactoria que no se destruye a no ser por un claro y convincente testimonio, y el peso de la prueba descansa en la parte impugnadora. Pero aquellas circunstancias de fraude, equivocación o sospecha que conducirían a una corte de equidad a dejar sin efecto un contrato, pueden ser demostradas ya en un procedimiento equitativo o legal para variar o impugnar el recibo. Aunque un documento sea en forma un recibo, si realmente es un contrato completo, debe gobernarse como hemos demostrado en la sección precedente, por las mismas reglas que se aplican a otros con-

tratos y no puede ser variado mediante evidencia oral. Si el documento tiene un carácter dual, siendo a la vez un recibo y un contrato, la parte que es un recibo puede ser explicada, y si un contrato es incorporado en un recibo o un recibo en un contrato, el recibo puede ser variado aunque el contrato no. Por ejemplo, un documento en la forma de un recibo, por artículos, especificando clases, números, precios y valor total, escrito de puño y letra de parte del que recibe y en el cual la otra parte acepta el dinero pagado, es un contrato de venta y no puede ser variado por evidencia oral. Y un documento en las siguientes palabras: 'Recibí de Jacob W. Loeb mil dólares para ser conservados por mí y devueltos a él mediante aviso con diez días de anticipación', que constituye un recibo y un contrato, no está abierto a explicación para contradecir la parte contractual; pero podrá desde luego estar sujeto a impugnación con respecto al recibo del dinero.''

Según apunta Jones, puede demostrarse mediante evidencia oral que no medió causa en el otorgamiento del recibo. En el caso de *Kenny* v. *Kane,* 14 Atl. 597, resuelto por la Corte Suprema de New Jersey, un Sr. Kenny, abogado de la Sra. Kane, declaró haber recibido de esta última una cantidad por servicios profesionales en un recibo que autorizó con su firma. Declaró el demandante que la demandada no le entregó ningún dinero. Admitió ésta que al tiempo de otorgar el recibo no entregó dinero alguno al demandante. El jurado rindió un veredicto en favor del Sr. Kenny. La Corte Suprema de New Jersey, confirmando la sentencia apelada, dijo entre otras cosas:

''El recibo es simplemente un instrumento de evidencia y fué correctamente definido por Lord Tenderlen en Graves v. Key, 3 Barn. & Adol. 313, cuando dijo: 'Un recibo es una admisión solamente, y la regla general es que una admisión, aunque constituya evidencia contra la persona que la hizo, y reclama bajo ella, no es concluyente, si se exceptúa a la persona que pudo ser inducida a alterar su condición por la admisión. Un recibo puede ser, por lo tanto, contradicho y explicado.' Y así lo sostienen todas las autoridades. Elwell v. Lesley, 7 N. J. Law, 349; Crane v. Alling, 15 N. J. Law, 423; Cole v. Taylor, 22 N. J. Law, 59; Wildrick v. Swain, 34 N. J. Eq. 167, 35 N. J. Eq. 326; Dorman v. Wilson, 39 N. J. Law, 474; Ensign v. Webster, 1 Johns. Cas. 145; Ryan v. Ward, 48 N. Y.

204; Bigelow, Estop. c. 18; 2 Whart. Ev., párrafo 1064 y casos citados en las notas. El resultado de un examen de estos casos es que aunque un recibo se otorgue con conocimiento y no haya error o fraude o equivocación, sin embargo si existe suficiente prueba de que no medió causa (*consideration*), el recibo no sostendrá la defensa de pago. Es un hecho admitido en este caso que no medió dinero u otra causa cuando se expidió el recibo, y que entonces la demandada expresamente prometió que pagaría después lo que debía. No hubo error en la sentencia y debe ser confirmada."

En el documento ofrecido como prueba por el demandante, la Sra. Viuda de del Moral ratifica un convenio anteriormente celebrado y dice que recibe por saldo de toda deuda, reclamación o acreencia, por capital e intereses, que sean en deberle José A. Domínguez y su esposa. No se dice en este documento qué fué lo que la Sra. Viuda de del Moral recibió por saldo. El Sr. Domínguez es el que refiere que le entregó $10,000 en moneda legal de los Estados Unidos. Afirma la demandada que no medió consideración en la alegada transacción, es decir, que el demandante no entregó cantidad alguna de dinero a la Sra. Viuda de del Moral. Entendemos que toda evidencia que tienda a demostrar que no hubo pago es admisible y que si se llega a la conclusión de que el demandante no entregó dinero alguno a la Sra. Viuda de del Moral, la acción ejercitada no puede prosperar.

Según explica el demandante, cuando su madre política, doña Carmen, puso su firma al documento, únicamente estuvieron presentes el propio demandante y doña Estebanía, una hija política de doña Carmen "que está hoy muerta." De modo que con excepción del Sr. Domínguez, ninguna otra persona pudo declarar en la vista de esta causa con respecto a la transacción mencionada. El recibo aparece firmado en 14 de mayo de 1921; doña Carmen Nadal fué declarada incapacitada en 29 de julio de 1929. Durante el tiempo comprendido entre ambas fechas, el Sr. Domínguez no comunicó a ningún familiar la existencia del recibo de saldo. Veamos lo que nos dice el propio demandante, respondiendo al interrogatorio del abogado de la parte demandada:

"P. Cuando Ud., el 14 de mayo de 1921, que dice el documento que doña Carmen le dió a Ud. recibo de saldo, ¿Ud. se lo comunicó a alguna persona de la familia?

"R. No, señor.

"P. ¿A nadie?

"R. No, señor.

"P. ¿Se lo comunicó usted a don Francisco del Moral?

"R. No, señor.

"P. ¿Cuándo fué la primera vez que Ud. le habló a don Francisco del Moral de existir el recibo de saldo que Ud. dice?

"R. Fué—no estoy exactamente seguro—pero creo que fué en 31 de diciembre de 1926, con motivo de haberse hecho esa escritura ante usted.

"P. ¿Esa fué la época en que por primera vez se lo dijo a don Francisco?

"R. Sí, señor."

Cuando el abogado de la demandada preguntó al Sr. del Moral si en el año 1926, al otorgarse cierta escritura sobre la finca hipotecada, se habló del recibo de saldo, el abogado del demandante se opuso a la pregunta. La corte desestimó la objeción. El abogado de la demandada tenía perfecto derecho a este interrogatorio, que no obstante modificó, preguntando al testigo cuándo fué que tuvo noticias por primera vez del referido recibo. Respondió el Sr. del Moral que la primera noticia la tuvo cuando recibió una carta en la cual el Sr. Domínguez se quejaba de que el Sr. del Moral incluyera en el inventario de los bienes de doña Carmen, radicado en la corte de distrito, diversas cantidades que fueron pagadas totalmente en el año 1921, según recibo de la Sra. viuda de del Moral que conservaba en su poder. Esta carta se escribió en 20 de septiembre de 1929, después de declarada la incapacidad de doña Carmen Nadal. Cuando se le pregunta al demandante qué razón tuvo para no decir nada respecto al pago de los $10,000, la única razón que ofrece es ésta: "Don Francisco del Moral y yo hemos sido enemigos desde un mes después de la muerte de su padre." Se le repite la pregunta de por qué no le dijo nada y contesta: "Por enemistad, Sr. Juez." Aun cuando fuese cierta la

manifestación del demandante de que mencionó el pago en 1926, siempre resultaría que dejó transcurrir cinco años para decir únicamente que había pagado, sin mencionar el recibo ni los $10,000, ni una palabra que se relacionase con la alegada entrega de dicha suma a doña Carmen. La corte inferior estuvo ajustada en no creer las manifestaciones del demandante en lo que respecta a esta vaga referencia, en 1926, de que la hipoteca había sido pagada. Ningún otro familiar aparece teniendo conocimiento de este recibo, antes de la fecha en que la Sra. viuda de del Moral fué declarada incapaz. El demandante comunicó la existencia del recibo de saldo a los Sres. Damián del Moral y Angel Martínez, hijo el primero y yerno el último de doña Carmen, cuando ya esta señora había perdido sus facultades mentales.

Llama poderosamente la atención que el Sr. Domínguez guardara silencio con respecto a la existencia de este recibo mientras la señora Viuda de del Moral conservó el uso de sus facultades mentales. La única razón que expone para justificar su silencio es la enemistad que dice existía entre él y el apoderado de doña Carmen, Francisco del Moral. A nosotros se nos ocurre que si esta enemistad existía, el Sr. Domínguez tenía aun mayores motivos para tratar de protegerse, elevando el documento privado a escritura pública, a fin de obtener la correspondiente cancelación del crédito hipotecario. Si el Sr. Domínguez había entregado ese dinero a la Sra. Viuda de del Moral, no tenía por qué abrigar temores con respecto a la publicidad del pago. El Sr. del Moral nada hubiera podido hacer en perjuicio de sus intereses, porque la propia madre política del demandante y doña Estebanía lo hubieran protegido, reconociendo que la deuda había sido satisfecha.

Sin embargo, el Sr. Domínguez, sin preocuparse de proteger sus intereses, permanece mudo y da lugar a que muera doña Estebanía y a que su madre política pierda el equilibrio de su razón. Hoy no existe más que un testigo para justificar el pago, y ese testigo es el propio demandante. *La muerte*

selló los labios de doña Estebanía, cuyo testimonio hubiese sido tan útil para esclarecer la verdad, y la incapacidad de doña Carmen nos ha privado también del beneficio de su declaración.

Refiere el Sr. Domínguez que recibió una carta suscrita por doña Carmen y además un memorándum o estado de cuenta acompañando dicha carta. Añade que luego de haber cambiado impresiones con doña Carmen, se entrevistó con su apoderado, don Francisco del Moral, surgiendo de esta entrevista el otorgamiento del contrato escrito sobre el reajuste y saldo definitivo de las deudas del demandante. Admite el Sr. Domínguez que no satisfizo la suma convenida dentro del plazo de noventa días fijado en el contrato, pero declara que el día 6 de enero de 1921, en ocasión en que doña Carmen, su suegra, vino a verle a su casa, hablando con ella, le dijo: "Doña Carmen, yo hice un contrato con Paco el año pasado; él me concedió que si yo pagaba $10,200 me daba un recibo de saldo. Yo no puedo acogerme al contrato y quisiera que Ud. me concediera hacerlo bueno." Doña Carmen, según el testigo, estuvo conforme. Cuando se produjo esta prueba el abogado de la parte demandada se opuso a su admisión, basándose en el caso de *Wilcox* v. *Axtmayer*, 23 D.P.R. 343. La corte inferior admitió la prueba y la demandada tomó excepción. La corte, sin embargo, no dió crédito alguno a las manifestaciones del demandante, según se deduce claramente del estudio laborioso que hace en su opinión de la prueba aportada en el juicio.

El demandante declara más tarde a preguntas del abogado de la demandada que doña Carmen ordenó a don Francisco que hiciera el convenio al día siguiente de haber tenido una conversación con su suegra. No obstante, en la conversación que dice haber tenido con ella en su casa aparece comunicándole como si fuese una cosa nueva el contrato que el año pasado había hecho con Paco del Moral.

Declara la corte inferior en sus conclusiones de hecho que en 22 de diciembre de 1921, o sea siete meses después

de haberse firmado el recibo de saldo por doña Carmen Nadal viuda de del Moral, se le entregó al demandante, a solicitud de éste, un estado de cuenta en el cual figuraba la deuda hipotecaria sin haber sido saldada y sin que el demandante protestara de ello.

El abogado de la parte apelante califica de injusta y apasionada esta conclusión, por entender que no está justificada por la prueba, y copia parte del testimonio de Francisco del Moral, con el propósito de demostrar el error que atribuye a la corte sentenciadora. El Sr. del Moral, teniendo en sus manos el copiador de cartas de doña Carmen Nadal, declara que era él quien llevaba el referido libro, que consta de 235 páginas, y que en el folio 83 del mismo aparece un memorándum de cuentas para José A. Domínguez y Micaela del Moral. Ese memorándum lo hizo Tomás Balzac, tenedor de libros de doña Carmen Nadal, y se envió al Sr. José A. Domínguez por el propio Sr. del Moral, quien lo puso en el correo. Dicho memorándum tiene fecha de 22 de diciembre de 1921.

Vamos a transcribir ahora lo que dijo el Sr. del Moral respondiendo al interrogatorio del abogado del demandante, quien únicamente copia en su alegato la última parte de la declaración del testigo:

"P.—¿Usted podría examinar el copiador de cartas?

"R.—Sí, señor.

"P.—Hágame el favor de verlo. Haga el favor de buscar el estado de cuenta respecto al año 28, al año 29 y 30 especialmente. Del 30 no le puede haber dado ninguno, pero, por ejemplo, busque el del año 28.

"R.—Tampoco hay del 28.

"P.—Pues busque la del 27.

"R.—Aquí hay una del 21.

"P.—Busque la del 23.

"R.—No hay.

"P.—Busque la del 24.

"R.—No hay.

"P.—La del 25.

"R.—No hubo necesidad; nunca lo ha pagado.

"P.—Haga el favor de decir a la corte si durante doña Carmen Nadal, su esposa y el Sr. Domínguez llevaban cuentas, cuántos estados de cuenta les han pasado.

"R.—Aquí hay uno.

"Hon. Juez: El del 21.

"R.—Hay uno del 20; del 30 de abril de 1920.

"P.—¿Y los de los años 23, 21 y 22?

"R.—No aparece ninguno."

El testigo aparece diciendo primeramente que hay un estado de cuenta en 1921, y luego, cuando se le pregunta sobre los años 23, 21 y 22, responde que no aparece ninguno. En esta última parte del testimonio del Sr. del Moral se basa el demandante para decir que la corte actuó con pasión e injusticia, al declarar que el estado de cuenta de 22 de diciembre de 1921 fué enviado al Sr. Domínguez.

Sin embargo, el abogado del demandante se olvida de que tuvo a la vista el copiador de cartas y de que en la transcripción de evidencia se hace constar por ambas partes, con la aprobación del juez de la corte inferior, que el documento ofrecido como prueba por la parte demandada y admitido con la oposición y excepción de la parte demandante, aparece en el libro copiador de cartas al folio 83. Aparte de que el demandante tuvo oportunidad de examinar el copiador referido, la transcripción literal del documento en el récord, tomada del folio 83 de dicho copiador de cartas, es la mejor prueba que puede ofrecerse de que el estado de cuenta de 22 de diciembre de 1921 consta impreso en dicho copiador. Y no es sólo Francisco del Moral quien habla de este memorándum y de su remisión al Sr. Domínguez. También el tenedor de libros, Tomás Balzac, declara, a preguntas del abogado del demandante, quien le pone de manifiesto los copiadores de las cartas de doña Carmen Nadal, que en 22 de diciembre de 1921 se hizo un memorándum para el Sr. Domínguez y su esposa a petición del primero, y que este memorándum fué remitido al Sr. Domínguez.

En el referido memorándum aparece una partida que dice así: "Préstamo garantizado de $5,000 y $8 sellos, $5,008." Es prácticamente igual a la partida que aparece en el memorándum enviado al Sr. Domínguez en 12 de mayo de 1920, que dice así: "Préstamo garantizado p/ $5,000 y sellos $8.00, $5,008.00." El demandante aceptó este memorándum de 1920 como correcto y reconoció que en el mismo existía una partida sobre la hipoteca de $5,000 que era la única hipoteca que el demandante le debía a doña Carmen Nadal. Lo mismo puede decirse de la partida que aparece en el memorándum de 1921, para los propósitos de la identificación.

En esta prueba se basa la corte inferior para concluir que el memorándum fué entregado al demandante. Y es natural que no se explique el silencio y la pasividad del Sr. Domínguez durante los ocho años que transcurrieron hasta que la Sra. Nadal fué declarada incapaz. A pesar de que en ese memorándum se hace figurar el préstamo hipotecario como deuda sin saldar, el Sr. Domínguez no se acerca a su madre política para hacerle saber que se le estaba cobrando una suma que había pagado. Su inactividad en 1921 contrasta con su diligencia en 1929, al tener noticia de que en el inventario de los bienes de la Sra. Viuda de del Moral se hacían figurar diversas cantidades que el demandante alegaba había pagado en 1921, según recibo de su madre política que conservaba en su poder. En 1921, cuando se recibió la cuenta incluyendo el crédito hipotecario, la Sra. Viuda de del Moral no había perdido el equilibrio de su razón. En 1929, cuando se radicó en la corte el inventario de los bienes de doña Carmen Nadal, ya ésta había sido declarada incapacitada. Estas circunstancias no pueden pasar inadvertidas para el juzgador. También declaró el Sr. del Moral que en el mismo copiador de cartas aparece, al folio 188, una carta dirigida al Sr. José Domínguez en mayo 18 de 1925. Esta carta, autorizada por el testigo como apoderado de doña Carmen Viuda de del Moral, fué enviada al Sr. Domínguez y puesta al correo

por el propio testigo, según manifiesta en su testimonio. La carta de referencia dice así:

"Mayagüez, P. R., marzo 18 de 1925.—Sr. D. José A. Domínguez, Ciudad.—Estimado Yerno:—Hacen varios días se presentaron a comprar el solar de esta Marina, que usted hace 9 años me hipotecó por la cantidad de $5,000.00 con sus intereses al 12% anual, y rebajados dichos intereses después de vencida la hipoteca al 10% anual, según convenio de abril 20 de 1928 hasta su total pago. Hoy dichos intereses montan más o menos alrededor de $5,000.00, pero como sólo ofrecen por el solar $8,000.00, y deseando que usted obtenga algún beneficio, estoy dispuesta a recibir por intereses $1,500.00 más el capital, es entendido que de no aceptar usted esta venta que se presenta hoy, retiro la rebaja que le hago en los intereses, quedando todo como fué convenido por documentos en mi poder.—Aunque he luchado por sacar algo más para beneficio de usted, no lo he conseguido, pero estoy en la seguridad de que si usted va donde la persona que compra, puede ser que consiga tal vez $500.00 de aumento.—En espera de su grata contesta sobre este particular, quedo de usted atta. amiga y s. s.—C. N. Viuda del Moral."

El señor Domínguez declaró que desde 1920 no recibió ningún otro estado de cuenta de la Sra. viuda de del Moral. Sus manifestaciones, sin embargo, no fueron creídas por la corte inferior. También fué admitido como prueba, con la oposición del demandante, el libro de inventarios y balances de los bienes de doña Carmen Nadal, con las cuentas llevadas por su apoderado, don Francisco del Moral, desde 1909 hasta 1929. En 17 de abril de 1926, doña Carmen Nadal aprobó mediante escritura pública los inventarios hasta la fecha practicados, haciendo constar que todas las cuentas contenidas en cada inventario "han sido examinadas y aprobadas por ella." Las cuentas del demandante y entre ellas el préstamo de $5,000, figuran en inventarios posteriores al año 1921, y en estos inventarios y en la declaración de Tomás Balzac se basa la corte inferior para decir que aparece de las cuentas que el demandante no ha satisfecho ni en parte ni en todo sus deudas con su suegra. Balzac declara que escribió en este libro hasta el año 1929 y que fué tenedor de

libros de doña Carmen pór veinticinco años. Cuando declaraba tenía a la vista el libro de inventarios. Estas cuentas, consignadas en los libros cuando no había interés alguno en alterar o falsificar los hechos, demuestran que la Sra. Nadal no consideraba saldado el préstamo hipotecario después del 1921.

El demandante hace mucho hincapié en una carta que escribió a su madre política en abril 23 de 1921. En esa carta dice entre otras cosas el demandante: "Deseo recordarle y suplicarle informe de ella a su apoderado, la conversación que tuve con usted en relación con mis propósitos de pagarle el saldo fijado de común acuerdo entre su dicho apoderado y yo en el convenio privado que suscribimos en el almacén de Moral & Cía. el día 24 de mayo pasado, y que usted bondadosamente me concedió sostener en vigor, ya que yo me propongo hacerle la entrega de dicha suma para saldar todas las deudas que tenemos pendientes con usted mi esposa Micaela y yo, cuya entrega espero hacerle dentro de muy corto tiempo, lamentando sinceramente que por haberse malogrado una operación de azúcar que debí realizar hacia el mes de mayo pasado, no me sea dable, como era mi deseo, solventar en aquella fecha las mencionadas deudas. Confío en que en muy breve plazo iré a verla y a efectuar la entrega, y con afectos míos y de Micaela para usted, me reitero su muy atto. amigo y S. S., (Fdo.) José A. Domínguez."

Que esta carta se escribió con algún propósito es evidente. El demandante la envió por correo, bajo pliego certificado, y aparece contestada en el libro copiador de cartas que llevaba el apoderado Francisco del Moral. "Parece que sufre usted un error," contesta doña Carmen, "al decirme que yo le ofrecí sostener en vigor el convenio que hizo usted con mi apoderado en 24 de mayo del año pasado pues usted bien sabe que yo no hago nada sin consultarlo con mi hijo y apoderado." Luego aparece el demandante haciendo su anunciada visita a su madre política para saldar sus deudas. Si el demandante, que no necesitaba adelantar este aviso de su visita a

doña Carmen para entregarle el dinero, escribió esta carta con la intención de dejar alguna constancia por escrito de que se disponía a pagar sus deudas, nos parece que habría realizado con más efectividad su propósito dando a conocer a sus propios familiares el pago de los $10,000 y cancelando mediante escritura pública el préstamo hipotecario. En esta ocasión y antes de verificarse el pago, el demandante no tuvo en cuenta la enemistad del Sr. del Moral para suplicar a doña Carmen que diese cuenta a su apoderado de la conversación que había tenido con ella y de su promesa de sostener en vigor el convenio. No obstante, después del alegado pago expone como razón para no dar a conocer la existencia del recibo su enemistad personal con el Sr. del Moral.

Hay otra carta escrita por el Sr. Domínguez al apoderado del Moral que merece también ser comentada. Esta carta se escribió con motivo de un procedimiento ejecutivo iniciado por el Banco Comercial de Puerto Rico contra José A. Domínguez en 15 de diciembre de 1921. Con respecto a la ejecución de esta hipoteca dice la corte inferior:

"Ante esta Corte se presentó en 15 de diciembre de 1921 el ejecutivo sumarísimo número 8646 del Banco Comercial de Puerto Rico contra José A. Domínguez, solicitando el pago de $4,700.00 de principal, $188.00 de intereses al 8 por ciento anual, durante los seis primeros meses y $846.00 por los dos años siguientes al 9 por ciento anual y $1.19 por día desde el 22 de Noviembre de 1921 hasta el pago más $300. para costas. El préstamo hipotecario que dió lugar a este procedimiento ejecutivo, fué contraído por el demandante el 21 de mayo de 1919 y no lo pagó ni en cuanto al principal ni en cuanto a los intereses que ascendían cuando se radicó el ejecutivo a $1,034 que no pudo pagar el demandante; y luego, dos años más tarde, transó el asunto el demandante con el Banco comprometiéndose a pagar $400 de contado y $200 mensuales.

"El demandante admitió que su suegra doña Carmen Nadal viuda de Del Moral, no le hubiera demandado nunca por las cantidades que le adeudaba y por lo tanto no existe explicación satisfactoria para la Corte de que encontrándose el demandante en una situación de no poder pagar ni los intereses de la deuda con el banco, dando con ello lugar a que se radicara un ejecutivo sumarísimo, pagara una

deuda que no le apremiaba y dejara sin pagar la que le podía traer graves perjuicios.''

El demandante nos dice en su alegato que este procedimiento ejecutivo se inició siete meses después de haber pagado a doña Carmen Nadal la hipoteca y que por lo tanto la corte inferior partió de una premisa falsa al establecer su conclusión. En la carta escrita por el demandante al Sr. del Moral, fechada en 19 de diciembre de 1921, se queja amargamente el primero de la conducta del segundo para con él y le hace responsable del fracaso de un negocio que le privó vender al Sr. Cabanillas su solar de la calle del Comercio que le hubiera permitido ''abonar $3,000 al Banco de Puerto Rico a cuenta de esta otra hipoteca que ahora van a ejecutar.'' Cabanillas estaba también dispuesto a pagarle $5,000 a doña Carmen ''al vencimiento de una hipoteca que ella tenía sobre dicha finca.'' Copiamos a continuación la última parte de la carta del Sr. Domínguez:

''Tengo hoy necesidad de evitar mi ruina y llamo a tu puerta para decirte que tú tienes contraído conmigo un deber de protección: tú consentiste en que tu casa de Comercio me atropellara anulándome una póliza que yo no había hecho; pero que yo tengo la positiva seguridad de que era buena y era legal y era justa, y yo perdí por tu indiferencia o por tu pasión una oportunidad de pagar mi deuda con el Banco, como perdí más tarde por igual motivo la oportunidad que tuve de reducir esta cuenta, por lo menos, si tú le hubieras aceptado a Cabanillas su proposición que era muy razonable y muy equitativa. Yo no pienso contestar la demanda que me interpone el Banco, porque es mi deber reconocer el derecho positivo que el Banco tiene a cobrar lo que me prestó y que yo no le he pagado y espero que tú me arregles este asunto; no pagando lo que yo debo sin la debida protección de tus intereses (como apoderado de doña Carmen que es a quien aludo y me dirijo al dirigirme a tí en mi solicitud sobre este asunto del Banco) sino en forma tal que esta deuda pase a poder de doña Carmen a quien yo la pagaré, bien recibiendo esta suma como anticipo a Micaela, bien quedando esta casa mía hipotecada para responder del capital e intereses. Pido esta ayuda, porque me es indispensable y porque no tengo a quien

recurrir en este crítico momento en que mi situación no permite hacer desembolso alguno.''

Basta leer la carta del Sr. Domínguez para comprender que la situación de que se queja comenzó desde antes del 14 de mayo de 1921. El préstamo hipotecario que dió lugar al procedimiento ejecutivo iniciado por el banco fué contraído en 21 de marzo de 1919, y el demandante no satisfizo ni la obligación principal ni sus intereses durante el tiempo que precedió al procedimiento ejecutivo. No podemos decir que la corte inferior cometió error al establecer su conclusión cuando el propio demandante dice al solicitar la ayuda de doña Carmen ''que en este crítico momento mi situación no me permite hacer desembolso alguno.'' Sin embargo, siete meses antes el demandante aparece pagando $10,000 a doña Carmen ''que no le hubiera demandado nunca'' y dejando en descubierto la hipoteca con el banco que culminó más tarde en el procedimiento de ejecución.

Es verdad que el demandante declara que en 1920 ó 1921 vendió una casa en $6,300 y que a fines del año de 1920 el International Banking Corporation le pagó $10,000 y don Mario Mercado $9,000, en virtud de la transacción de un pleito de daños y perjuicios; pero su carta dirigida a del Moral demuestra que no podía hacer desembolso alguno cuando la escribió, y es raro que si hubiese recibido en las fechas mencionadas las cantidades que alega, careciese de dinero para pagar al banco una hipoteca de $4,700.

Declara el demandante que entregó a doña Carmen nueve billetes de $1,000 y dos de $500. A preguntas del abogado de la parte demandada contesta que además había un pico de $746 que la Sra. del Moral regaló a un hijo del demandante. Y preguntamos nosotros, ¿qué hizo doña Carmen con este dinero? Ni su apoderado ni sus demás hijos tuvieron conocimiento del pago y del recibo que aparece otorgado, mientras doña Carmen conservó el uso de su razón. No es fácil disponer de una cantidad de $10,000 sin que alguien se entere, y no aparece que doña Carmen tuviese alguna razón

para ocultar el dinero y no comunicar la transacción a sus hijos. Lo natural es que hubiese dado cuenta a su hijo y apoderado de la entrega del dinero para que hiciese el abono y desapareciesen de sus libros las cuentas del demandante.

En el sexto error se alega que "una vez tenido por satisfactoriamente comprobado, el tribunal inferior lo genuino de la firma, estampada de puño y letra de la acreedora hipotecaria en el recibo que acredita el pago de la hipoteca en cuestión, erró la corte inferior al estimar que medió fraude en el otorgamiento de dicho documento, pues tal afirmación no aparece justificada ni por la prueba del demandante ni por la de la demandada, ni por inferencia alguna."

La corte inferior, luego de hacer constar que con respecto al otorgamiento del recibo de saldo sólo ha podido declarar el demandante, por haber muerto doña Estebanía y estar la Sra. del Moral incapacitada, dice que después de considerar la prueba practicada, incluso la declaración del calígrafo, y de examinar las demás firmas indubitadas de doña Carmen, se inclina a creer que la firma de dicha señora estampada en el recibo es su firma genuina. El documento que describe el convenio celebrado entre el demandante y el apoderado de doña Carmen, con la alegada ratificación del mismo, tiene un carácter dual, por la relación contractual que en el mismo se advierte y las palabras "recibí por saldo." La corte inferior entiende que no medió consideración en el alegado otorgamiento de este recibo y nosotros creemos que estuvo justificada en su conclusión.

En el séptimo error señalado por el apelante se alega que el procedimiento ejecutivo seguido contra el Sr. Domínguez por Francisco del Moral como tutor de la incapacitada es nulo, porque el tutor no estaba debidamente capacitado ni tenía personalidad para representar a dicha incapacitada como tal tutor.

Francisco del Moral fué designado tutor de doña Carmen Nadal por nombramiento judicial, que aceptó y desempeñó hasta que esta Corte Suprema declaró que de acuerdo con

el Código Civil, cuando se trata de la incapacidad de un padre, el nombramiento del tutor debe recaer en el hijo mayor, sea éste varón o hembra. Cuando se tramitó el procedimiento ejecutivo cuya nulidad se pide, el Sr. del Moral actuaba como tutor de la incapacitada, en cuyo beneficio se ejercitaba el procedimiento sumario para el cobro de una deuda. De acuerdo con el artículo 56 del Código de Enjuiciamiento Civil, cuando un menor, demente o persona incapacitada es parte en un litigio, deberá comparecer bien por medio de su tutor general o de un defensor nombrado por la corte que entienda en el asunto, en cada caso, o por el juez de la misma. Aún admitiendo que Francisco del Moral no podía desempeñar las funciones de tutor general, cuando se inició y ultimó el procedimiento ejecutivo, siempre tendríamos que la corte inferior concedió autorización a dicho señor para cobrar el préstamo hipotecario por la vía sumaria. El Sr. del Moral solicitó este permiso de la corte, y si ésta, después de haberse penetrado del propósito que se perseguía, autorizó a dicho señor del Moral para que ejercitase el procedimiento mencionado en beneficio de la incapacitada, entendemos que no procede declarar nulo dicho procedimiento, por el hecho de que el hijo mayor de doña Carmen no hubiese sido nombrado todavía tutor general de la misma. La realidad es, como dice el abogado de la parte demandada, que existía una escritura de hipoteca firmada por el demandante a favor de doña Carmen Nadal; que esa hipoteca había vencido; que el demandante no pagó el importe de la misma ni sus intereses y que por lo tanto, la acreedora tenía derecho al cobro de de su crédito y que el hecho de que don Francisco del Moral representara a la incapacitada, que es su propia madre, previa autorización judicial, no puede ser motivo de nulidad, por el fundamento de que el hijo mayor de la incapacitada no había sido nombrado tutor general. El nombramiento de tutor recayó en doña María del Carmen, hija mayor de la incapacitada, y ésta ha comparecido en este caso en su carácter de tutora para oponerse a la nulidad del procedimiento

ejecutivo, solicitada por el demandante. La comparecencia de la incapacitada por medio de su legítimo tutor pone de relieve su asentimiento a las actuaciones llevadas a cabo en la tramitación de dicho procedimiento por el Sr. Francisco del Moral.

El demandante no discute el octavo error. Se basa en que la corte admitió como prueba el procedimiento ejecutivo instado por el Banco Comercial contra el Sr. Domínguez en 15 de diciembre de 1921. Se alega en el señalamiento de errores que la corte cometió error, pero no se dice en qué consiste este error. Debe desestimarse.

El noveno error se basa en haberse admitido como prueba la escritura en que la Sra. Carmen Nadal aprueba los inventarios practicados por su apoderado Francisco del Moral. En estas escrituras figuran, en los inventarios posteriores al año de 1921, las cuentas del demandante, entre ellas el préstamo de $5,000. Se desestima también este error.

El décimo error se basa en haberse admitido como prueba el libro general de inventarios de los bienes de doña Carmen Nadal por los fundamentos de que siendo un libro de contabilidad de la demandada y habiéndose aceptado el balance que ella misma envió al demandante como fiel y exacto, la Sra. Nadal está impedida de presentar prueba que pueda impugnar ese estado de cuenta. La prueba es admisible. Figuran en estos libros los inventarios anuales que se practicaron sobre los bienes de doña Carmen Nadal. En los mismos aparecen las cuentas del demandante con posterioridad al año de 1921. Es ésta una circunstancia de las muchas que intervienen en este caso, en que la parte demandada sostiene que no medió consideración en el alegado otorgamiento del recibo de saldo. No es cuestión a considerar en estos momentos el hecho de que la demandada pueda o no impugnar una cuenta anteriormente pasada. Lo esencial es averiguar si se entregaron o no los $10,000 en pago de las deudas del demandante.

En el onceno error se alega que la corte inferior admitió

indebidamente una carta del colector de rentas internas de Mayagüez con relación al remate de la propiedad en litigio por falta de pago de contribuciones al Pueblo de Puerto Rico. En el documento admitido por la corte, el colector de rentas internas de Mayagüez notifica a doña Carmen Nadal que El Pueblo de Puerto Rico se ha adjudicado la propiedad que se describe, que es la misma hipotecada a esta señora, para el pago de contribuciones adeudadas por los años de 1926-1927 y 1927-1928. Esta notificación la dirige el colector a la señora Carmen Nadal por tener ésta un crédito hipotecario sobre dicha propiedad.

El colector promete suspender la ejecución por un período de cinco días para darle a la acreedora hipótecaria la oportunidad de acogerse al artículo 333 del Código Político y evitarse tener que pagar intereses al 12 por ciento anual, como ocurriría una vez adjudicada definitivamente la propiedad al Pueblo de Puerto Rico. El documento fué reconocido por el propio colector, quien compareció como testigo de la parte demandada. Se presentaron como prueba con este aviso o notificación los recibos de contribuciones de los años 1926-27 y 1927-28, los cuales aparecen pagados por doña Carmen Nadal viuda de del Moral, sobre la referida propiedad. No cometió error la corte al admitir esta prueba. El abogado del demandante se opuso especialmente a esa admisión, porque no se le dió la oportunidad de examinarla. El mencionado aviso y los recibos de contribuciones son documentos que pueden ser fácilmente comprendidos y examinados. El abogado del demandante tuvo oportunidad de examinarlos y probablemente los examinó cuando se ofrecieron como prueba. Si no lo hizo debe culparse a sí mismo y no atribuirlo a falta de oportunidad.

El demandante pasa por alto, sin discutirlos en su alegato, los errores 13, 14 y 15, que hemos examinado y declaramos sin lugar.

El error décimosexto se basa en haber admitido la corte cierta carta presentada por la parte demandada. Esta carta

es una contestación a la dirigida por el Sr. Domínguez al Sr. del Moral en 19 de diciembre de 1921 que fué aceptada sin oposición por el demandante. El Sr. del Moral se limita a decir al demandante que le devuelve el procedimiento ejecutivo incoado contra él por el Banco Comercial y que habló con doña Carmen y ésta no puede atender lo que el demandante solicita. Esta prueba, en realidad impertinente, no ocasiona perjuicio alguno al demandante.

El error décimoséptimo se basa en haberse admitido por la corte ciertos pagarés suscritos por Francisco del Moral como apoderado de doña Carmen Nadal a favor del Royal Bank of Canada y por José A. Domínguez como miembro de la mercantil Martínez & Domínguez, S. en C. La parte demandada entiende que era pertinente demostrar que doña Carmen había pagado por el demandante ciertas cantidades de dinero que correspondía pagar a dicho demandante. Es ésta una prueba muy remota, que no aparece conectada con las cuestiones en controversia. Sin embargo, aunque no vemos la pertinencia de la prueba, se trata de un error sin importancia alguna que en nada afecta la cuestión de si el demandante satisfizo o no el dinero que alega haber pagado a su madre política.

El error décimoctavo, que no se discute por el apelante en su alegato, se limita a decir que la corte inferior no debió admitir cierta prueba, pero no se exponen las razones en que se basa la objeción. Debe desestimarse.

El error décimonoveno tampoco se discute en el alegato del apelante. Lo hemos examinado y también debe desestimarse.

El vigésimo error se basa en haber permitido la corte que el testigo Tomás Balzac, a preguntas del abogado de la demandada, declarara con relación a constancias de libros de la demandada, pues la mejor prueba son los mismos libros. El Sr. Balzac declaró teniendo los libros a la vista y aparte de que su testimonio es admisible, estos libros fueron presentados como prueba.

El error vigésimo primero se basa en haber permitido la corte inferior que se preguntara al testigo de la demandada Angel Martínez cuándo fué que se habló del recibo de saldo y cuándo fué que lo vió dicho testigo por primera vez. La pregunta es completamente pertinente. Angel Martínez, hijo político de doña Carmen Nadal, declaró que vió por primera vez el recibo de saldo en el año 1930 y que el demandante le habló de haber pagado a doña Carmen Nadal $10,000 en billetes de $1,000 después de haber sido dicha señora declarada incapaz.

El error vigésimo segundo no aparece discutido por el demandante en su alegato y debe ser desestimado por carecer de importancia.

El error vigésimo tercero se basa en haber permitido la corte inferior "que el testigo Angel Martínez, a preguntas del abogado de la demandada, contestara con relación al propósito que guió a éste a otorgar un contrato escrito, el cual no tiene conexión con la controversia en cuestión." Este documento fué presentado por el propio demandante, quien está en lo cierto al decir que no tiene conexión con la controversia. Arguye el demandante en su alegato que dicho documento se ofreció como prueba con el propósito de demostrar que doña Carmen Nadal había contratado directamente, sin intervención de su apoderado, con el Sr. José A. Domínguez. Doña Carmen autorizó una garantía de $10,000 que Domínguez se obligó a devolverle en caso de que tuviese que satisfacer esta suma. La persona favorecida por la garantía, Angel Martínez, socio del Sr. Domínguez, que acababa de venderle su participación en la sociedad Martínez & Domínguez, S. en C., declaró en relación con esta transacción que preguntó a don Francisco del Moral si daría la firma de la madre, y que en la oficina del Lic. Angel Vázquez, estando presentes don Francisco del Moral, don José A. Domínguez y el declarante, se hizo el documento después de haberse convenido en tomarle la firma a doña Carmen Nadal. Esta prueba no contradice, como alega el demandante, el mencionado contrato,

que después de todo no tiene conexión alguna con la controversia.

El error décimo cuarto no se discute por el apelante en su alegato. Carece de importancia y debe desestimarse.

La sentencia de la corte inferior debe ser sostenida. La parte demandada no ha podido producir evidencia directa acerca de la falta de causa en el otorgamiento del recibo de saldo. Tres personas intervinieron, según el demandante, en dicho otorgamiento: Doña Carmen Nadal, su hija doña Estebanía y el propio Sr. Domínguez. Doña Carmen ha sido declarada incapaz y doña Estebanía ha muerto. Únicamente queda un testigo, y éste es la persona a cuyo favor aparece otorgado el recibo de saldo. La parte demandada ha presentado, sin embargo, la única prueba posible compuesta de un cúmulo de circunstancias que hablan elocuentemente y que justifican el fallo de la corte inferior.

*Debe confirmarse la sentencia apelada.*